January 15, 2022 *and*
*March 30, 2022* UNITED STATES DISTRICT COURT

PHILLIP BURTON FEDERAL BUILDING

450 GOLDEN GATE AVE.

SAN FRANCISCO, CA 94102

**In Re: Case No. 3:21-CV9107**

Maria Ecke

Estate of David Jonathan Ecke

Richard Ecke

Andrew Ecke

Peter Sottile

Pro Se

C/o The Office of Maria Ecke

8 Glenbrook Drive

West Simsbury, CT 06092

sagitarianm2004@yahoo.com

860-658-7745                                                                )**Plaintiffs**

v.

McKinsey & Company, Inc.                                         )**Defendants**

)**JURY TRIAL DEMANDED**

)**CIVIL L.R. 3-6(b)**

)**Civil L.R. 3-7(a)**

**INTRODUCTION SUMMARY OF THE CASE**

Opiates kill 100,000 people each year. Even one person is one too many! Like most of the country, Connecticut is in the grip of a devastating opioid epidemic that stems directly from the Defendants' unlawful business practices. My dear son, David Jonathan Ecke, was driving to college and was at a dead stop on a bridge when he was rear-ended by another car. He was hit so hard that his truck rear-ended the car in front of him. His dad and I worked odd shifts, so he had to get

- 1 -

Group first prescribed OxyContin to my firstborn. Later, because this tall, skinny teenager was hurt so badly David Jonathan Ecke could not turn his neck to look around when driving yet he still had to go to school to keep his medical insurance through me. Since he was nineteen, I could not see his medical records. I told him to go to Dr. Shifreen who I had heard was a miracle worker. Though his back manipulation techniques helped, David was prescribed opiates in **2010**. David continued getting opioids prescribed to him by Dr. Shifreen until his death on **December 17, 2015**. He had become addicted to opioids for 5 years and they killed my beautiful son. **David Jonathan Ecke did not deserve the opioid death sentence that the greedy Sacklers and McKinsey & Company bestowed upon him**.

When Purdue Frederick Company, the parent company of Purdue Pharma, pleaded guilty on May 7, 2007, with the Office of the Inspector General of the Department of U.S. Department of Health and Human Services ("HHS")., they agreed to a Corporate Integrity Agreement for 5 years ending on May 10, 2012. In the agreement, Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." They were supposed to have an Independent Monitor and submit yearly reports regarding its marketing and sales practices and training of sales representatives. Nonetheless, Purdue and the Sackler family still intended to maximize the sales of OxyContin and not abide by the rules.

## ALLEGATIONS

### COURTS FOUND PURDUE LEGALLY LIABLE AND RESPONSIBLE FOR MISLEADING AND FALSE ADVERTISEMENT ON THEIR PRODUCT LABELS SO PURDUE IS BOUND BY CORPORATE INTEGRITY AGREEMENT

If a purchaser for Purdue could not be found, Richard Sackler stated that Purdue should "distribute more free cash flow" to the Sacklers. This is an acknowledgment that reinvestment of profits in the business was not a sound strategy. This was also the acknowledgment that Purdue's reputation and the franchise were irrevocably damaged thus making Purdue's opioid business not profitable. On May 17, 2007, David Sackler wrote to Richard Sackler, his dad, and his Uncle Jonathan Sackler about the legal liability barely ten days after the guilty plea was announced about the legal liability of selling OxyContin with a copy Stephen A. Ives, another Purdue executive.

From the beginning of McKinsey's known work for Purdue, the work was sad and unsettling. McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff in June 2009 to discuss how to change the emotional messages from mothers with teenagers that overdosed on OxyContin.

```
Message
From:         David Sackler
Sent:         5/17/2007 11:08:08 PM
To:           'Sackler, Jonathan'              Sackler, Dr Richard
CC:           Ives, Stephen A.
Subject:      RE: Idea
Attachments:  image001.jpg
```

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

The above is cited from Page 5, City of Pembroke Pines, Florida, Case 3:21-cv-04384-CRB.

### PURDUE HIRES MCKINSEY TO IMPLEMENT AND TO BOOST OPIOID SALES DESPITE THE COMPANY'S GUILTY PLEA AND CORPORATE INTEGRITY AGREEMENT SO THAT THE SACKLERS CAN DISTANCE THEMSELVES FROM THE COMPANY

Both sides of the Sackler family wanted to either sell the company or to merge the company with another pharmaceutical company so that the Sackler family could distance itself from the bad reputation that Purdue already had and keep their wealth intact.

After the 2007 guilty plea, Purdue only kept $300 million within Purdue – the minimum amount. That amount was because of a partnership agreement with a separate company. The rest of the money was distributed to the owners.

The money from the sale of Purdue could be re-invested into other diversified assets. To do this, they had to boost OxyContin's sales to sell or borrow money. Thus, the Sacklers decided to boost the sales of OxyContin and made large distributions of money to themselves so that the company would seem attractive to a new buyer or merge partner or worthy of getting a loan against.

Since this goal was difficult to achieve and the Sacklers did not have an in-house person to do the job, they decided to hire McKinsey and Company, a global management and consulting company. McKinsey and Company had already been advising Purdue for at least three years.

***Given the strictures imposed on Purdue by the 5-year Corporate Integrity Agreement, McKinsey & Company was hired to increase the sales of OxyContin.*** It is known that McKinsey performed the work for Purdue not how they were hired. By June of 2009, McKinsey and Purdue were working together to increase sales of opioids made by Purdue. Purdue adopted McKinsey's management and consulting ideas. This increased the sales of Purdue's opioids despite the Corporate Integrity Agreement. This in turn created a dependence on McKinsey & Company's presence and advice. In 2007 Purdue Pharma began to reevaluate their capabilities of dealing their highly addictive drug OxyContin to innocent customers by strategically aiming their

3

objective of bringing their total sales to a much higher level by their marketing strategies were driven almost exclusively by its aggressive marketing of OxyContin. (See JX2094.0047-88; JX-2481). Purdue had admitted that it had falsely marketed OxyContin and had submitted false claims to the federal government. OxyContin had been falsely marketed as being non-addictive and submitted false claims of medically unnecessary opioid prescriptions to the federal government for reimbursement.

Sales of OxyContin had grown immensely but in 2013 sales had begun to slump. With McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy designed to increase sales by **hundreds of millions** of dollars annually was implemented. In 2014 Purdue then picked a new name, which McKinsey proposed – E*volve 2 Excellence* – and adopted it as the theme to its national sales campaign. Sales of OxyContin flourished. Purdue with McKinsey's assistance, Purdue trained its sales representatives to operate according to McKinsey's strategy for selling OxyContin.

In "Unsettled" by Ryan Hampton, a nonfiction book about the Purdue crisis, on page 252 it says: "The information attached to the DOJ's Sackler settlement added weight to allegations that the family knew about and approved of the strategy known as *Evolve to Excellence,* in which the highest-volume prescribers, who wrote twenty-five times as many OxyContin scripts as the normal prescriber, were singled out and targeted by marketers." On page 253 of "Unsettled" by Ryan Hampton, it states "The government's filings included an intriguing subplot: A "consulting company" had helped Purdue come up with Evolve to Excellence. Though the company wasn't named, it could only be McKinsey & Company, the management consulting firm credited with transforming corporate culture in the 1960s, McKinsey had been connected to numerous scandals over the years, including Enron and the 2008 financial crisis. … In America, the firm makes big bucks working with state-run institutions for unemployment and COVID-19 relief. According to *The Wall Street Journal*, New York governor Andrew Cuomo "awarded McKinsey a $9.9 million contract in March to advise the state on issues related to COVID-19, the illness caused by the coronavirus. That included eighteen weeks of "leadership counseling" at $42,500 a week…..McKinsey also did work for Massachusetts, some of which appeared to involve little more than forwarding others' material along." Also in "Unsettled" on page 254: "McKinsey's link with state and federal governments was already problematic, but when they worked with Purdue to market opioids, the outcome was deadly."

To identify which parts of the client's existing business are areas for growth McKinsey uses the "granular" approach and exploits them. McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter in August of 2008: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (2008). "The key is to focus on granularity, to break down big-picture strategy into its smallest relevant components." From *The granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008),https://www.mckinsey.com/business-functions/strategy-and-

4

corporate-finance/our-insights/the- granularity-of-growth.

In an article published the same month that Purdue plead guilty the authors of McKinsey Quarterly stated:

> "Our research on revenue growth of large companies suggests that executives should'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micro-markets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete." From Mehrdad Baghai et al., *The granularity of growth*, MCKINSEY Q. (May 1, 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of- growth

It is known that McKinsey counted Purdue as a client at least as early as 2004. The length of the relationship between McKinsey and Purdue and its owners has not been configurated, although it is known that McKinsey worked with Purdue for years *before* Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007 and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Corporate Integrity Agreement. The work continued through at least 2018.

The Sackler decided to back away from their daily jobs because of the 2007 guilty plea "several family members who worked at stepped back from their operational roles" From Barry Meier, *Pain Killer* 167 (2018). Richard Sackler resigned as the president and became co-chair. Dr. Kathe Sackler and Jonathan Sackler exited the roles as senior vice presidents and Mortimer D.A. Sackler quit being a vice president. With this distancing, the Sacklers established Rhodes Pharmaceuticals L.P. in 2007. Rhodes would sell generic versions of opioids. The Sackler's share of the opioid market would become 6% of all the opioids sold in the United States.

On January 17, 2014, new CEO Mark Timney received reports that to increase profits, the sales representatives must again increase the number of sales visits to "high value" prescribers. Thus, they tripled the OxyContin sales. McKinsey proposed to Purdue to pay money – "rebates" – to health insurers when someone overdosed on Purdue's drug. And that they would even provide estimates for future overdoses. The amount that McKinsey prosed for each person's overdose was between six and fifteen thousand dollars – what an insult to the integrity and empathy for other human beings!

Purdue spent millions of dollars implementing McKinsey's specific plans but in 2018 saw the decline of the sale of the drug "OxyContin". By then the Sacklers had withdrawn millions of dollars from Purdue Pharma which McKinsey had made for them with its consultation and

marketing strategies of opioids. McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating crisis for Purdue. McKinsey had come under intense scrutiny for its work and its business practices with Purdue facilitating the opioid epidemic. On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Using inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little Mcdoubt that scrutiny - fair and unfair - will continue. It is the price we pay for being 'in the arena' and working on what matters." *See "The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, FORTUNE MAGAZINE (Mar. 8, 2019), https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/ Before the unraveling of marketing of OxyContin McKinsey had given the boost in sales but by the time of 2018, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The number of sales representatives was cut back to 200 people – the number that Purdue had before the launch of OxyContin.

Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated. to support key stakeholders working to combat the crisis," McKinsey stated. From *the authors McKinsey quarterly.*

This Court has subject matter jurisdiction over this action under 28 U.S.C.§1332(d)(2), because: (a) David Jonathan Ecke was a citizen of a state different from Defendant McKinsey; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) none of the exceptions under the subsection apply to this action.

Work facilitating the opioid crisis for Purdue for its business practices. had caused McKinsey to come under intense scrutiny [4] On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Using inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little Mcdoubt that scrutiny - fair and unfair - will continue. It is the price we pay for being 'in the arena' and working on what matters."[5]

Purdue spent millions of dollars implementing McKinsey's specific plans but in 2018 saw the decline of the sale of the drug "OxyContin". By then they had withdrawn millions of dollars from Purdue Pharma which McKinsey had made for them with its consultation and marketing strategies for opioids. McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating crisis for Purdue.

On April 23, 1910, Theodore Roosevelt delivered a speech which refers to *Citizen in a Republic*: "It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongsto the man who is

6

actually in the arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.

No insurance company wanted to back OxyContin and Purdue could not buy insurance to cover the selling of the drug. Maximizing opioid sales in the face of a national disaster led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. TIMES (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

My lawsuit argues that McKinsey is liable for its deeds. It grew Purdue at the expense of millions of lives including my son, David Jonathan Ecke. McKinsey is liable for Purdue's colossal sales of OxyContin. Because Purdue had pleaded guilty to misbranding, McKinsey helped the Sacklers increase the sales of OxyContin despite the strictures imposed by the 5-year Corporate Integrity Agreement, and now the Sacklers and McKinsey & Company want to exit the opioid market with ***their blood money. McKinsey and Purdue were fully aware of what they were doing in sacrificing our children and others for their own gain. The turbocharging of sales of a drug that they knew was addictive and deadly.***

Negligence is when the Defendant must care for the plaintiff but breaches the duty and causes harm because of the breach. When McKensey is found legally liable and held responsible to make the plaintiff whole again and reimburse for the loss and then does not follow through and pay restitution in many matters or forms resulting in the Defendant's lack of constituting the Court decision of this negligence they may be more liability due to the Plaintiffs for the refusal of the Defendant to restitute the Plaintiff in the first place thus resulting in a second injury to mind, body, or soul.

McKinsey issued a rare public statement on December 5, 2020, regarding its work with Purdue, and the statement was issued in response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

## McKinsey Statement on its past work with Purdue Pharma

December 5, 2020-As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue

7

fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

McKinsey stopped doing opioid work "anywhere in the world" but the damage has been done. The Sacklers are still pursuing opioid work with Mundipharma, a separate company with Tim Reiner, a long-time McKinsey consultant at the helm. Mundipharma is also owned by the Sacklers and it sells opioids internationally.

Reiner, "Chief Business Officer", is currently at Mundipharma. As late as 2019 many of the same misleading claims about opioids that previously led to criminal liability in the United States are still being used elsewhere in the world by Mundipharma as late as 2019. *See* Erika Kinetz, *Fake doctors, pilfered medical records drive OxyChina sales*, ASSOC. PRESS (Nov. 19, 2019), https://apnews.com/article/4122af46fdba42119ae3db30aa13537c.

### DEMAND FOR TRIAL BY JURY

McKinsey is guilty of negligence, gross negligence, negligent misrepresentation, public nuisance, fraud and deceit, civil conspiracy, civil aiding and abetting, unjust enrichment, and finally deceptive and unfair trade practices. Therefore, the plaintiffs **DEMAND A TRIAL BY JURY AND**

### PRAYER FOR RELIEF

I, Maria Ecke, the Estate of David Jonathan Ecke, Richard Ecke, Andrew Ecke, and Peter Sottile ask the Courts for the relief of $242,000,000.00 for each of us. With the money for the Estate of David Jonathan Ecke I, Maria Ecke, will start a foundation -"A Star for David"- to benefit the people that have been affected by drugs and I will donate money to "Hearts of Hope" a mothers' group which has given me solace in my ultimate despair.

### CERTIFICATION

I, Maria Ecke, certify that what I say is true on ~~January 23, 2022~~ March 30, 2022, and under Civil L.R. 3-6(b) and Civil L.R. 3-7(a) that I should be included in this lawsuit.

State of Connecticut  
County of Hartford  S.S. - Simsbury

On this the 30th day of March 2022 before me Michael Junko the undersigned officer, personally appeared Maria Ecke satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

/s/ Michael S. Junko

My commission expires 07/31/2024

MICHAEL STEVEN JUNKO  
Notary Public  
Connecticut  
My Commission Expires Jul 31, 2024

/s/ Maria Ecke, Pro Se  
*Maria Ecke*

/s/ Peter Sottile  
*Peter Sottile*

/s/ Estate of David Jonathan Ecke  
*Maria Ecke*

/s/ Richard Ecke  
*Richard Ecke*

/s/ Andrew Ecke  
*Andrew Ecke*

8